Good morning, Your Honors. May it please the Court, Ian Hoffman on behalf of the appellant, Mr. Thomas Heyer. Your Honors, this is a case about the Federal Bureau of Prisons' years-long refusal to provide Mr. Heyer, a deaf man in the BOP's custody, with the simple, reasonable accommodations that he requires to communicate with the outside world, to receive adequate medical care, and to participate in religious proceedings while in the prison environment. The Bureau of Prisons demonstrably can provide the requested accommodations, but has refused to do so for years on the most tenuous and disputative grounds, thereby violating Mr. Heyer's constitutional rights. The district court erred by granting summary judgment in favor of the federal government defendants on all of Mr. Heyer's claims. The court should vacate that decision and, at a minimum, remand this case for a trial on the merits. Your Honors, the first way in which the district court erred was by granting summary judgment in favor of the federal government defendants on Mr. Heyer's First Amendment free speech claim, seeking reasonable access to a video phone device that would enable him to communicate with friends and family and others outside of the prison environment. The U.S. Constitution guarantees Mr. Heyer the ability to communicate with family and friends outside of prison. Hearing prisoners, of course, are permitted to exercise this right by speaking on the telephone, writing letters and emails as well. But the evidence put forth below is that Mr. Heyer lacks the ability to communicate in these methods. He cannot use a telephone, and the unrebutted expert evidence put forth below is that he lacks the ability to communicate via written English, which is not his native language, and which he lacks the fundamental ability to do and to do effectively. Excuse me. Have you looked at the case law at all about the rights of detainees who speak a foreign language? Yes, Your Honor. Only a foreign language. Right. Yes. And I believe that the analogy would not be entirely apt for communicating with others outside of the prison because non-English speaking detainees, for example, could speak on the telephone to other individuals in their language. The existing technology, the telephone, enables them to communicate with, say, a Spanish speaking detainee or inmate. I thought part of your claim was an inability to speak to people in the prison as well, to communicate with people in the prison. That is correct, Your Honor. So that you would have the same problem there with somebody who did not speak English. Yes, Your Honor. And I believe that the case law does bear out that, for example, for medical claims, that non-English speaking detainees would be entitled to a translator to receive adequate medical care if there are serious medical needs that that person needs and needs to communicate with a doctor that the Constitution would require the inmate to be provided sufficient communication abilities in the prison environment. You don't make any Disability Act claims here, right? That is correct. Mr. Heyer attempted to and did bring Rehabilitation Act claims. Those claims were dismissed without prejudice for failure to exhaust administrative remedies. And Mr. Heyer has pursued those administrative remedies in parallel with this suit. And those administrative proceedings continue to date. And Mr. Heyer attempted to, midway through discovery, reinstate those claims so that they would all be brought together here. But the district court denied that request. So the administrative claims, yes, Your Honor, are continuing to proceed. Mr. Heyer has a separate constitutional right to obviously many of the same accommodations to which he is requesting. The standards might differ slightly, but he is constitutionally entitled to these same accommodations. The Bureau of Prisons on Appeal, Your Honor, can test as a matter of fact whether Mr. Heyer needs access to a videophone or whether written English language modes of communication are sufficient to enable him to communicate with others outside the prison. And so doing, they argue that the court doesn't even need to get to the Turner analysis because there's been no actual impingement of Mr. Heyer's constitutional rights. But that is just a pure dispute of fact. In the Dr. Coakley expert report at the Joint Appendix 347 to 389, Dr. Coakley clearly concludes, and Dr. Coakley is a linguist and a leader in the field of deaf linguistics, he concluded with respect to Mr. Heyer that communication via e-mail and TTY, which is a written mode of communication that deaf people have used in the past, communication via e-mail and TTY are ineffective for Mr. Heyer at JA 378. JA 350, Mr. Heyer cannot communicate effectively in written English. So the contention that Mr. Heyer, on appeal, that Mr. Heyer can simply write letters is a matter for a fact finder to determine at trial. The district court below rejected Mr. Heyer's claim, granting summary judgment in favor of the defendants with two sentences of analysis. Two sentences of analysis on a claim which is heavily fact dependent and has four Turner factors, each of which have a host of facts beneath them. And this is at Joint Appendix, I believe, page 145. The district court first stated that the evidence demonstrated that the Bureau of Prisons could, in fact, have the capability to provide access to a video phone. But second, that all four Turner factors weigh in the defendants' effort. Your Honor, even the language of that sentence and its conclusory nature demonstrates the district court's error because at the summary judgment stage, it is not the district court's role to weigh any facts or weigh factors in one party's favor or the other. In fact, the burden on the district court is to construe all the facts in Mr. Heyer's favor in opposing the BOP's summary judgment motion. This case is thus akin to the Jehovah v. Clark case from this court in 2015, in which this court reversed the district court's grant of summary judgment in favor of a prison when the district court evaluated the Turner factors at the summary judgment stage instead of letting those factors play out at a trial. Your Honor, I won't belabor each— Wait, is it your position that you could never, once you have the Turner factors in play, you could never have summary judgment? No, Your Honor. Okay. No, of course. But I think the case law bears out, the case law from this court, is that it is a fact-intensive inquiry. And certainly, there are cases in which there might not be material disputes of fact as to each factor. But in this case, there are a host of material disputed facts. Again, the Bureau of Prisons has conceded that to provide Mr. Heyer access to a video phone at Butner would impose de minimis costs. And as evidenced by the 28J letter we submitted a few days ago, Your Honor, the BOP already has recently begun providing video phone and video relay service to another inmate at another institution, the same institution in which the BOP had conducted a study that concluded that providing video phones and video relay service would not be consistent with their security concerns. So this is a paradigmatic example, Your Honor, of an exaggerated response to hypothetical security concerns. It's an exaggerated response because, of course, any inmate could abuse telephone privileges. Any inmate could abuse any privileges to which they are given in the prison environment. But to respond to that hypothetical type of abuse with an outright complete ban when there are easy alternative methods, and there's evidence below that there are easy alternative methods that the BOP could use to provide a video phone, on those facts, summary judgment just can't be awarded to the prison. And I just want to be totally clear with the feasibility of providing a video phone because some of the defendants' suggestions in the briefs are that this is a very new technology, and it's very cutting edge, and it's very advanced. It is certainly not an old technology, but video phones have been in widespread use, particularly in the deaf community, for at least a decade or so. And at the prison in Butner, the defendants already have conceded that they have all of the necessary equipment and hardware to provide this service. They already have committed to providing what's called video remote interpreting at Butner for Mr. Heyer. And all that would be required to provide access to a video phone is it's downloading the software, which is free. So it's akin to downloading an app on an iPhone to provide this to Mr. Heyer at Butner. And it can be monitored locally. It can be monitored. Well, of course, they raise the spectrum. This is going to have to be system wide. That would be a huge expense. They certainly raise that, Your Honor, but that is not a concern that has hindered the BOP in the past from taking up institution-specific needs for institution-specific accommodations for institution-specific needs. I didn't even think you were arguing that the entire institution had to do this. I thought you just were concerned about your client. That's right. I certainly am, Your Honor, and I thought your question was aimed— It was. Right. So, yes, I mean, Mr. Heyer is not even claiming that anyone else in the prison complex— It's not a class action. It's not a class action. It's not an institution-wide action. It's not a nationwide action. And the sort of domino-type argument that the BOP puts forward is just not a legitimate concern to deny one inmate access to a reasonable accommodation because it might be difficult to, in a hypothetical world, to provide that same accommodation nationwide. Can you talk about your medical care claim? Yes. First of all, what standard must the prison follow? What standard are they held to? It is a deliberate and different standard for the constitutional claim, and there are certainly objective and subjective components to that, and the evidence in this case is sufficient to at least merit a trial. Are you sure that it's deliberate and different? This guy is a civil detainee. Your Honor, there are certainly cases out there in which the standard is lessened for civil detainees. I'm not aware offhand of whether there are medical, with respect to the provision of medical care, whether it is. I'm thinking cases that have involved involuntarily committed psychiatric patients, and the question is what is the standard of care? Do them, and I'm not sure that it's deliberate and different. Your Honor, I certainly believe that, as a general matter, civil detainees are, the prison is expected to handle them with a higher degree of care, and certain prison concerns like anything about retribution or anything punitive is not applicable to civil detainees. So we would treat this case, just track and write, and maybe the standard ought to be professional judgment. So we would have this case kind of like the 8th Circuit did, where neither party went there, so we just let it ride. I certainly don't want to pass on the opportunity to argue, but in your briefs, in your papers, and at oral argument, you said the standard, you told us what the standard was, and so what are you asserting is the standard? At present, Your Honor, it's deliberate and different standard, because I believe the evidence showed that the prison acted with deliberate indifference by refusing Mr. Heyer's request for interpreters for all instances of medical appointments in the prison context for years. And Mr. Heyer asked, when he arrived at Butner in 2008 for interpreters, no interpreters were given for any medical appointment for four years. That alone is egregious enough to satisfy even the deliberate indifference standard. Well, okay, let me just, I'm really not going to beat this horse, but are you telling us that you've looked at the cases, and you seem to be familiar with the case my colleagues were talking to you about, and you decided that actually deliberate indifference is the standard here? Notwithstanding those cases? Your Honor, I did look at the other cases, and- Maybe you can just share with us your rationale. It's simply, I'm not recalling offhand case law concerning whether deliberate indifference standard applies to civil, whether some lesser standard, or a higher standard, I would say, for medical care applies to civil detainees, rather than deliberate indifference. I can certainly look into it, Your Honor, if the Court is interested in supplemental briefing or anything of that sort. Our last point, Your Honor, is that with respect to many of Mr. Heyer's claims, the district court and the federal government defendants below relied heavily upon, I would say mid-litigation or even post-discovery attempts at providing accommodations for Mr. Heyer that were simply put in affidavits at the summary judgment stage saying, from henceforth, we will provide X, Y, Z accommodations. Those accommodations were vehemently opposed and refused throughout the discovery period, and on the eve of summary judgment, the Bureau of Prisons seemed to relent and at least make statements that they would, going forward, provide- Why can't they rely on the federal government agencies committing themselves to do that? Well, this court in the Walby-Wade case specifically declined to apply a lesser standard to the federal government, providing them more solicitude or deference in respect to those statements. And so, with respect to all parties, federal government or not, to moot a claim based on a voluntary cessation of unlawful conduct, the defendant must- See, I'm out of time. I might finish my answer question. The defendants- To show that it would be, I believe the case law language is that it would be nearly impossible for the party stating that they would no longer engage in that conduct to revert. The Feldman v. Pro Football case and the Walby-Wade case demonstrate that even programmatic changes, even high-level policy statements and things like that, are not adequate to satisfy that burden to moot Mr. Heyer's claims. Thank you very much. Good morning. Good morning, Your Honors. Robert Dodson for the Federal Bureau of Prisons and its officials. Throughout this litigation and in the argument today, appellant Mr. Heyer has argued for a different means of exercising his constitutional rights rather than demonstrating that those preferred methods are required. In addition, the appellant throughout the litigation has conflated standards. And the standards for these different causes of actions are more than, I believe the language was slightly different standards. They are very much more slightly different standards. In this case, as we are today, is a constitutional right. Does Mr. Heyer have a constitutional right to his preferred method of communication or the best method of communication? Well, help me with this because I thought the record evidence at this point is undisputed that written English he cannot communicate in and spoken English he cannot communicate in, nor any other spoken or written language. Well, the evidence, Your Honor, is that Mr. Heyer can communicate at essentially a fourth grade level in English. And his own testimony… I thought the expert said that was not reliable.  Well, what we do know is that Mr. Heyer himself… Am I misrepresenting the record? Do you have an expert that says the contrary? We don't have an expert, Your Honor, to say that. But what we do have is Mr. Heyer's own testimony during his deposition that he can understand some written English, and that is corroborated by the expert who said that in some non-complex situations, Mr. Heyer can communicate in a written way. And that's corroborated by Mr. Heyer himself who has stated that he's used the prison's email system to email his brother. And he said, yes, my brother can understand me, and I can understand him. And his brother, by the way… I thought the record was a little more foggy about that, and I thought the number of times when he actually was able to do the system was pretty small over a period of years. It is. Maybe I'm misrepresenting, misunderstanding the record. You're not misunderstanding the record in that regard. But the fact is that the system, the email system, for example, which is one of the many ways that he can communicate outside of a video phone, is that he did use it from time to time and that he testified that his brother could understand him and he could understand his brother, who, by the way, he testified doesn't know ASL. So, you know, the bottom line is that there is no case law, and the appellant didn't cite any, to assert the fact that the Constitution requires a video phone. Some other standard, the Rehabilitation Act, the Americans with Disabilities Act, that may provide a theory under which Mr. Heyer is entitled to a video phone. Well, okay, let me just ask you this. Do you just say as a matter of law, no matter what kind of condition, no matter what the record is here, there's no entitlement to a video phone? Yes, Your Honor. Is that what your claim is? Yes. Because otherwise you have a dispute to material facts, don't you? There are some disputed facts, but as a district court held in this regard, because the district court found as a matter of law that Mr. Heyer doesn't have a constitutional right to a video phone, and I'm not aware of any court that has held that. Well, I understand that, but I'm asking you, I understand that you quarrel with what the record does say or does not say about his capabilities, but if you have, as I understand it, there could be somebody that cannot communicate at all in written or verbal English, and a video phone would be their only way of communication, but you would say there still isn't any First Amendment right. Well, those aren't the facts here because... I understand. Remember I just said to you that we have some person that cannot communicate in written or spoken English and can only do it through that device and only do it that way, but you'd still say there's no First Amendment violation. Is that right? That's correct, Your Honor, because... And why is that? Well, and if you take Mr. Heyer's case for... No, I want you to tell me why that as an absolute is correct, because otherwise it seems to me we get into disputes as to fact. I think in order to answer that question, we have to examine what exactly Mr. Heyer has access to at the prison. And to answer that question... Or a person, let's say a person, another person would have access to... Or a person in Mr. Heyer's... No, a person in my hypothetical plaintiff's position, because you say as an absolute you're not entitled to the video phone. Correct. Under the Constitution... Right. You're not entitled. That's what I'm saying. That person would not be entitled. So we're having somebody that is totally not able to communicate in written or spoken English. Okay. Correct, because one thing that you do have is, and Mr. Heyer has, is in-person visiting. So you take a person like in your hypothetical who cannot speak or write or communicate otherwise in the English language. The Constitution allows for that person to have communication with the outside world, but not the most advanced and the most easily used way. First, you have in-person visiting, which Mr. Heyer has full access to. He can have friends, family, attorneys... But none of those people can communicate in the way that he can. It doesn't make any... It's nice to see them, but I don't understand how there would be communication. Well, the government is not constitutionally required to provide someone... Mr. Heyer has to have some level of responsibility on himself and on his family to... The prison would certainly allow an interpreter, the family to have an interpreter there to interpret if they needed to. There's no prohibition on that. There's no evidence that Mr. Heyer has ever been prohibited from having an ASL interpreter during a visit. He's had such visits. An interpreter would do it, as far as you're concerned. An ASL, in-person ASL. If it wasn't in-person, there just wouldn't be a way to communicate. That may be true. That may be true. But, again, at the prison, there have been, in Mr. Heyer's case, a multitude of accommodations which have allowed him to communicate. And that is through certified ASL interpreters who come... The video remote interpreting equipment. The prison has gone to some lengths to provide a means by which Mr. Heyer can communicate. But the idea that, notwithstanding all these accommodations, that the prison is somehow violating Mr. Heyer's constitutional right because they won't allow him to use a video phone to make social calls, there's been no court that has ever held that. And there are other means by which Mr. Heyer can do that. And the TTY is another example. You keep saying that. I understand what you're saying. But I think the record's in dispute on that, so that you have to really go with face-to-face discussion with an interpreter is sufficient. Sure. And that's certainly been provided to Mr. Heyer. I want to touch on, too, that courts have given prison officials substantial deference in their judgment as to whether or not to implement a video phone. There's been some discussion today about another federal institution implementing a video phone. That's not in the record. We've read the letters. Sure. And I would assert again that we think that's an improper use of Rule 28J. It's not a supplemental authority. It's a supplemental fact. But even still, what may be appropriate to a federal sentence, someone who's convicted, inmate, somewhere else, may not be appropriate for Mr. Heyer's situation as a civil detainee, as a sexually dangerous person. And that brings us to an interesting question, which is, isn't the standard somewhat different and lesser? Well, under a Youngberg analysis, or that line of cases where it says that civil detainees are to be treated not with a deterrent or with a retribution or punishment means, and that they are to be treated a little more, given a little more allowance than you would a federal prisoner. So it's not that, but it's specifically with regard to Mr. Heyer. I thought you were telling us just the reverse. So a federal prisoner can get this device, but he can't because he's – or one of the reasons why he couldn't be getting it is because he's a civil detainee. But this court has held and other courts have held that, in fact, the rights of a civil detainee are greater than the rights of a prisoner. That is very true. But I'd like to point out here that I think the distinguishing factor here is that Mr. Heyer is civilly detained as a sexually dangerous person. And that doesn't mean that he is set apart from other civil detainees as far as his conditions of confinement go. His conditions of confinement should be somewhat better than a sentenced inmate. However, the things that Mr. Heyer is allowed to have and possess and use and access should be looked at in the context of a sexually dangerous person. And the prison officials took that into consideration when they consider implementing a video phone for a sexually dangerous person. Not to say that that will never occur, but the prison officials in their judgment should be given some deference to their consideration of, should a sexually dangerous person be allowed access to a video phone? And at the time that this case was at district court, they found that the decision was that they would not do that. How is that any different than a regular phone? I'm sorry? For purposes of security. Well, one of the things you have to consider, and this is in the record and has been argued, is that telephone obviously is different from a video in that it's real time. You can see things that are happening in the community. You know, you can't unsee things. And for someone who is a sex offender, I'm not saying that this is in Mr. Heyer's case, or that there's any evidence that he's ever tampered with or did that, but it's something that the prison officials have to keep in mind. There's no delay thing that you can put on phones? Not that I'm aware of. It's live. It's a live video feed. A telephone is live. The words, in other words, you're saying the same thing happens with a telephone. You don't have any control over it? It's not that there was control. There is some monitoring of the TTY, and there's some monitoring of the video phone. And so there would be monitoring of this. Of the video phone as well, yes. But, again, you can cut. In fact, I would think it would be because it's so unusual. Right. It would be pretty real-time as opposed to looking at after facts. So there would be more. Right. But I want to just always bring it back to, you know, this is a constitutional claim. When Mr. Heyer first brought this case, it was a Rehabilitation Act and a constitutional claim. The Rehabilitation Act is not here today. And the case in Tucson, the prison in Tucson which implemented the video phone, was done as a result of a settlement in a case that asserted Rehab Act claims and Americans with Disabilities Act claims. And that was done as a result of a settlement in a case that is not a constitutional question. There's no dispute that can a video phone be implemented at the prison in Butner? Yes, it can. That's not the question. The question is, does the Constitution require it? And had the prison officials violated the Constitution by using their judgment and not allowing a video phone? Or is there a factual dispute with respect to that? That's what's really the question. Well, or is there? Because we don't, resolving it in favor of Mr. Heyer doesn't get him a judgment here. Sure. And the district court found that before he even got there, so this court not even need to get to the disputed facts and there doesn't need to be a trial on it because the district court found as a matter of law that the Constitution, there was no constitutional right to a video phone and therefore there can be no constitutional violation. Can we talk about the medical care? Yes, Your Honor. So what standard do you think it is? I do believe that it is a deliberate indifference standard because Mr. Heyer is a civil detainee. He brought, we believe appropriately, his claim under the Fifth Amendment. But the Fifth Amendment lines of cases have used the deliberate indifference analysis when going through those Fifth Amendment claims. So we believe that Mr. Heyer had to show an objective and subjective two-pronged test in order to meet his claim that he received inadequate medical care. And there are some disputed facts here. The Bureau of Prisons acknowledges that. However, as a matter of law, there is no constitutional violation. And it's simply because the standard, the Eighth Amendment standard, a part of that is the subjective, as I said, and that is type of conduct that would shock the conscience of a jury. And if you look at the facts that are undisputed here, no reasonable trial fact could look at these, the record here, and decide that any prison official acted with malice or their conduct shocked the conscience. And that's because of their belief that Mr. Heyer could understand them and that what they were communicating in their limited communication and communications through an inmate interpreter, that Mr. Heyer was receiving adequate care. As this Court knows, those prison officials had to draw the inference that the lack of interpreter was causing Mr. Heyer to experience harm or injury or a substantial risk of that. Do you think that harm is required in order to prove deliberate indifference? Harm is not required, but it is probative of the fact, it's probative of the question, did Mr. Heyer suffer or have a substantial risk of injury? Well, there's a big difference in harm and risk. I just want to make sure we're on the same page about that. Yes, Your Honor. Risk is all that's required.  Harm may be relevant, but risk is what's required. Sure, harm is relevant. And again, we believe it's just probative of whether or not there was a risk. And it is undisputed that for a period of time, Mr. Heyer did not receive certified ASL interpreters in his interactions with medical providers. But what we do know is that sometimes, or most of the time, an inmate interpreter was present. Now, there's testimony in the record, and the Bureau of Prisons acknowledges now that that was not optimal, that that was not, you know, what was the best case scenario. But does it rise to the level of shocking the conscience when Mr. Heyer comes to a medical appointment, he's there with his treatment provider, and his treatment provider gives him instructions through the inmate interpreter, and the medical provider believes that Mr. Heyer understands him. And later on the record, it's established that Mr. Heyer didn't, in fact, appear to understand what was going on because he showed up to... But I thought the record showed that he didn't, in fact, understand. There were instances where he did understand because of this reason. But I thought there were also instances where he didn't. Well, but those, we don't need to get there because... All you need is one instance where you don't understand a medical prescription to be in serious trouble, right? I mean, I'm talking about this case, I'm talking about the world. That's possible in the world, yes, that is possible. But in this record, there's no evidence that even one instance of Mr. Heyer not having an interpreter caused him some substantial risk of injury. There is no evidence of that. I don't think there's, there's no... I think we're going back to Judge Trostler's question about risk and the actuality of injury. Because isn't there evidence in the record that there are instances where he didn't understand the prescription and he wasn't taking the correct dose? That is a disputed fact but need not be resolved by a jury, Your Honor, because, again, you have to look at, yes, objectively, Mr. Heyer, it was optimal for him to have a certified interpreter. But the subjective state of mind of the treatment providers and of the prison officials is what's important here. Yes, it seems that a person who only speaks in ASL, of course they would need or want an interpreter present during a medical visit. But does it rise to the level of a constitutional violation? If an inmate can't tell the doctor what's wrong and can't understand the doctor who asked him questions, you don't believe he has a constitutional right to be able to do that? He has a constitutional right to receive adequate medical care. And if he can't... That's getting the care involved. Well, there's... That sounds like the bare minimum to me. You know, you have to make a, it's not a big leap in logic, but you have to make some connections that, you know, and there's other case law, for example, with Spanish-speaking people who go to a doctor and they're trying to communicate back and forth and they are receiving some medical care. And even in Mr. Heyer's case, you know, he went to a doctor. The doctor prescribed him medication and told him how to take it. And, in fact, Mr. Heyer showed up at the prison institution's pill line to get his medication. So there was some understanding of what he was supposed to do and the dosages that he was supposed to take. And Mr. Heyer testified in his deposition that he did understand the doctor. He did understand the instructions. He knew how many milligrams of his medication to take and when to take it. So there was some understanding. And the medical records reflect the doctor's understanding that there was adequate communication back and forth between them. It wasn't as if, you know, the doctor and Mr. Heyer just threw up their hands and said, well, we can't understand each other. We'll just, I'll see you later. Here, take these. And go away. Take two aspirin. There was some level of understanding between the two. And that does not rise to the level of a constitutional violation. Your Honors, I see I'm running out of time. I want to briefly touch on the last issue of Mr. Heyer's religious claims. The district court found that the prison officials unequivocally stated that Mr. Heyer would be provided a certified ASL interpreter if he wanted to attend religious ceremonies. Is there an affidavit? There is a written affidavit from a prison chaplain who gave out specific instructions that if Mr. Heyer wants to come to a religious program, the prison will provide in unequivocal terms a certified ASL interpreter for him to do so. And the chaplain has the authority to do that? And the chaplain has the authority to do that. And because of this reason, federal regulations have always required that all prisoners be allowed to have access to federal programs just the same as any other inmate. So it's not as if the prison— But he'd been denied. So, I mean, just because, you know, you're coming up here as a defendant and saying, well, the law requires. Therefore, we're okay. But if you hadn't followed the law, there's a problem, right? Well, I see my time. I'm out of time, but I'd like to answer the question, Your Honor. I was saying that to make the point in the context of this voluntary cessation argument that appellants make, that, you know, the prison officials have made this written sworn affidavit that they will provide Mr. Heyer an interpreter, but that that can't be the basis for summary judgment because then the prison could just, after litigation is over, could just, you know, revoke their promise. That's not going to happen, and that's part of the analysis of whether or not the voluntary cessation doctrine applies. That's not going to happen because not only do you have the sworn written statement, unequivocal statement of a Bureau of Prisons official, you have that backed up with federal regulations which require it. But didn't the federal regulations pre-exist the sworn statement? Right. So that I don't understand how. Yes, and I'll close the loop for you. I'll close the loop for you if I can. I know I'm running out of time. In closing the loop, you're right. They've always required it, and that's the point. There is a disputed fact as to whether Mr. Heyer at his time at Butner had ever requested to attend a religious ceremony. The prison chaplains who are responsible for these programs say, Mr. Heyer's never requested to attend. However, you have Mr. Heyer saying, well, no, I told them I would like to attend. So that is a disputed fact. So what is the affidavit doing for that? So the affidavit, what the affidavit is doing is supporting the chaplain's statement saying that, you know, Mr. Heyer never came to us and said he wanted one, but had he done it, we would have given him one because the federal regulations require it. So that's a little murky because you start raising disputed facts flags, but that's not the analysis here. The analysis is just whether or not the prison is going to revoke their promise of providing him an interpreter for religious services, and they're not because of these two reasons that a bureau of prisons official unequivocally stated so. It has been, although not in the record, it has been implemented, and there's no indication and no evidence that the chaplain will go back on their affidavit or that they will violate those federal regs. And if they do, Mr. Heyer can avail himself of the Bureau of Prisons Administrative Remedy Program to enforce his rights. Your Honors, if there are no further questions, I request that this Court confirm the district court's decision. Thank you very much. Thank you. Your Honors, I certainly want to be responsive to any remaining questions that the panel may have, but absent that I'll respond to a few points made by counsel for the defendants. There were suggestions, Your Honor, that the situation in Arizona with the Bureau of Prisons providing an inmate in Arizona with access to a video phone is somehow distinguishable from the present circumstance because of the nature of Mr. Heyer's commitment as a sexually dangerous person. But as Judge Motz very correctly pointed out, sexually dangerous persons committed at Butner in the exact same program as Mr. Heyer are provided access to the telephone. And so the exact same very hypothetical and speculative concerns that Mr. Heyer might somehow act inappropriately via video phone are the same concerns that someone could act inappropriately via telephone. And there are a myriad of lesser ways than an outright categorical ban on that communicative technology to address those hypothetical concerns. And by the way, in Mr. Heyer's entire tenure at Butner, he's never been the subject of a single disciplinary infraction and the like. And so it is a purely hypothetical concern that he would somehow try to abuse this privilege to which he's been litigating for years to try to get. On the deliberate indifference issue and the lack of adequate medical care, I heard defendants' counsel to concede that actual harm is not required for Mr. Heyer to demonstrate and at least adduce sufficient facts to go to trial on the issue of whether his constitutional rights were violated with respect to medical care. And that is significant because that is the only basis on which the district court granted summary judgment in favor of the defendants was the district court's conclusion that there was no evidence of actual harm. And the district court apparently overlooked the fact that substantial risk of serious harm is adequate to make out such a claim and to prove out such a claim at trial. The only arguments I heard on the deliberate indifference point, Your Honors, was the subjective state of mind point. But there's ample evidence in the record to permit that claim to go to trial. And it's an issue for the fact finder to bear out as to whether the risks were substantial enough in light of the prison's knowledge and need, knowledge of Mr. Heyer's need for an interpreter and their totally inadequate provisions for years. There's reference made to an inmate interpreter, but as the panel accurately pointed out, that does not cut it. And when the prison knows that another inmate has zero experience whatsoever in the language in which Mr. Heyer speaks, sticking that third party into a complicated medical discussion with a doctor does nothing to enhance Mr. Heyer's ability to communicate. I don't speak a word of Mandarin Chinese. If someone asked me to accompany someone who speaks only Mandarin Chinese to a doctor's appointment, it would do nothing to facilitate that communication. And on the issue as to what kind of impact the lack of communication had, it's a fact question. Mr. Heyer attested in his verified complaint that he didn't understand, at times, his medications. And the documentary evidence shows that after one of Mr. Heyer's seizures while he was in prison, the doctor noted that he had missed his medication. And there's also some notes in that doctor's chart that Mr. Heyer might have missed his medication for some other reason, but parsing out the reasons for these things is not appropriate at the summary judgment stage, particularly in the factual record in this case. Mr. Heyer requests injunctive relief and damages or just injunctive? Just injunctive relief. We didn't speak much, Your Honors, about the TTY device, but I did just want to make it clear that Mr. Heyer does put forward an alternative claim for relief for adequate access to the TTY device. We believe the record is, there's ample evidence to show that that is insufficient to ensure communication. But if the court were to disagree, Mr. Heyer would, at a minimum, seek more consistent and reasonable access to the TTY. Did the district judge get any ruling right? And if so, which one? We are certainly challenging on appeal only the First Amendment claim with respect to communication and the medical care claims. And then under the umbrella of challenging the district court's voluntary cessation, his failure to apply that, that cuts across several other claims, including the religious claims and the like. I believe one claim that comes to mind that we are not challenging on appeal is with respect to whether the Bureau of Prisons violated Mr. Heyer's procedural due process rights with respect to the commitment and treatment program, because there was a window of time in which he was not provided interpreters for that program as well. That window of time, the district court concluded, was fairly short, and so couldn't make out a claim on that. And that is not something we are pursuing on appeal. If there's no further questions, Your Honor, I appreciate the court's time and attention today. Mr. Heyer, with respect to the request that the court vacate the district court's decision and remand for further proceedings. Thank you very much. Thank you. We'll come down and greet the lawyers and then go directly to our last panel.
judges: Diana Gribbon Motz, William B. Traxler Jr., Henry F. Floyd